**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 19-21658-Civ-WILLIAMS/TORRES

GISELE ROTH SAIZ WENDEL,

        Plaintiff,

v.

INTERNATIONAL REAL ESTATE.
NEWS, LLC and DAVID BASCH,

        Defendants.

_____/

DAVID BASCH,

        Defendant/Third-Party Plaintiff,

v.

DAVID FARRON,

        Third-Party Defendant.

_____/

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

        Before the Court are Gisele Roth Saiz Wendel's ("Plaintiff") and David Basch's

("Defendant") cross-motions for summary judgment.  [D.E. 117, 129].  Both parties

filed their respective responses and replies.  [D.E. 135, 139, 144, 149].  Therefore, the

motions are now ripe for disposition.[1]  After careful consideration of the motions,

---

[1]     The Honorable Kathleen M. Williams referred the motions for disposition to
the undersigned Magistrate Judge respectively on May 11, 2020 and May 25, 2020.
[D.E. 120, 131].

responses, replies, relevant authorities, and for the reasons discussed below, we recommend that Defendant's motion for summary judgment be **GRANTED in part** and **DENIED in part** and Plaintiff's motion for summary judgment be **GRANTED in part** and **DENIED in part**.

## I.  BACKGROUND

Plaintiff filed this action on April 29, 2019 against Defendant and the company International Real Estate.News, LLC ("IREN").  [D.E. 1].  The Court entered default judgment against IREN on August 15, 2019 [D.E. 32], and Plaintiff subsequently filed a second amended complaint against Defendant that has four counts pending: (1) FLSA minimum wage violations, (2) FLSA overtime violations, (3) breach of contract, and (4) unjust enrichment.  [D.E. 62].  Defendant has filed a third-party complaint against David Farron ("Farron") for common law indemnification.  [D.E. 31, 76].

IREN was a short-lived company that never saw success.  It was formed in February 2018 and stopped operating in November 2018, generating no more than $300 in revenue.  IREN was co-owned by Defendant (47.5%), Farron (47.5%), and Defendant's former wife, Clodes Basch, (5%).  Defendant provided half of IREN's initial capital contribution ($32,000) and paid attorneys to form IREN and draft its formation documents.  IREN's business was centered around a website that would market international real estate by providing live real estate news and pricing information similar to how Bloomberg covers Wall Street 24/7.  Defendant first registered the name of IREN's website in February 2016, before Defendant and

2

Farron first met in 2017.   IREN engaged Citrus7 LLC, a company owned and operated by Plaintiff's husband, Mr. Wendel, to create IREN's website.

IREN operated out of Defendant's condo in Miami Beach, Florida from its inception until its operations started to wind down.   Farron not only worked out of Defendant's condo but lived with Defendant and Ms. Basch in the apartment from about January 2018 until April 2018 while the three of them worked together to build the business.   In addition to the three owners, IREN's employees and interns (about half a dozen total) worked out of Defendant's condo.   Defendant's condo operated like a typical office, albeit in unusual surroundings.   The employees worked in the living and dining rooms and were there on work days for generally at least eight hours a day.   IREN's business records were kept in the condo.   IREN paid housekeepers to clean the condo after each work day and technicians to keep the air conditioning working when it broke.   Defendant would host real estate agents and brokers there. IREN even turned one room into a "green room," which was stocked with video production equipment to film content for IREN's website.

Defendant was the President of IREN, and Ms. Basch used the title COO and Farron used CEO.   In general, Farron handled administrative tasks, and Defendant, a self-described luddite, did his work for IREN via meetings and phone calls.   Both Defendant and Farron attended team meetings, which were held in Defendant's dining room.   Defendant and Farron co-signed third-party agreements, including the agreement with Citrus7, and each were signatories on its bank account.   Farron typically handled payroll, but Defendant would occasionally sign pay checks.   Farron

was the point person on running operations for IREN, but Defendant oversaw the operations and had a say in how things were done as he was the one with real estate experience.  For example, Defendant caused IREN to market properties that he owned through Basch, LLC on IREN's website.

Once IREN's website was operational, IREN hired Plaintiff to help promote it. Plaintiff worked out of Defendant's condo while she created on-line campaigns in social media and developed related search engine optimization tasks to drive internet traffic.  Prior to this job, Plaintiff, a citizen of Brazil, worked in digital media, including creating campaigns to drive internet traffic to news websites in Brazil. Sometime in 2016, Plaintiff came to the United States on a L-2 visa as a dependent on a spouse with an L-1 visa, Mr. Wendel.  At some point, IREN and Plaintiff agreed that Plaintiff should obtain a work visa in connection to her employment at IREN.

To manage the visa process, IREN hired an immigration attorney, Adriana Gomez.  This process included the completion of a U.S. Department of Labor ("DOL") Program Electronic Review Management ("PERM") application.  Ms. Gomez prepared the PERM application and sent Plaintiff a questionnaire to collect information for it. Ms. Gomez also met with Plaintiff on at least three occasions to review and discuss its contents.  Farron also assisted in the preparation of the PERM application and Defendant was copied on emails regarding its progress.  Ms. Gomez took at least three months to prepare the PERM application and communicated poorly about its status. Ms. Gomez was also responsible for soliciting job applications from other candidates by posting the job description online, a requirement of the work visa process, but was

slow to complete this as well.  This delay concerned Plaintiff.  Plaintiff preferred the work visa because it would allow her to travel more freely between the US. and Brazil unlike her L-2 visa could.

Ms. Gomez finally submitted the PERM application in November 2018 after it received final review by Plaintiff and Farron.  The final version shows that Plaintiff's employment commenced with IREN on September 1, 2018, and that she worked 40 hours a week with no overtime.  Almost immediately after the application was submitted, however, Farron told Ms. Gomez to withdraw the application because IREN had ceased operations.  Ms. Gomez never acted on this directive, however, and the DOL eventually certified the application, and Plaintiff obtained a work visa.

At some point, everyone involved with IREN stopped communicating with Defendant.  With the business falling apart, Defendant paid off IREN's negative checking account balance before closing it. Defendant then intended to formally dissolve IREN but did not know where some of IREN's accounting paperwork was located.  So Defendant did not think he could dissolve IREN properly.  As a result, on January 31, 2019, Defendant and Ms. Basch, while still married, filed a derivative action on IREN's behalf in Florida state court against Farron and Mr. Wendel.  Their derivative state action sought to dissolve IREN and added claims that Mr. Wendel misappropriated IREN's business opportunities when he formed a new company with Farron without Defendant's knowledge.  A few months after Defendant and Ms. Basch brought the state action against Farron and Mr. Wendel, Plaintiff initiated this action.

## II.   APPLICABLE PRINCIPLES AND LAW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are

'implausible.'" *See Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, a court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In making this determination, the court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III.  ANALYSIS

Plaintiff's motion requests the Court to determine if: (1) Plaintiff is entitled to individual coverage under the FLSA; (2) Defendant is an "employer" under the FLSA; and (3) Defendant is a "joint employer" under the FLSA.  We quickly resolve the first issue because Defendant concedes to it, and we already concluded the same when entering default judgment against IREN.  [D.E. 24].  Because we already found that Plaintiff was engaged in interstate commerce while working at IREN, *see id.*, and Defendant does not dispute this, Plaintiff's motion that she is entitled to individual coverage under the FLSA should be **GRANTED**.

Defendant, in his cross-motion, seeks summary judgment on all four causes of action against him.  Defendant first argues that Plaintiff is judicially estopped from bringing her two FLSA claims because her PERM application limits Defendant's liability to an 11-week period to which Plaintiff has already been made whole.[2] Defendant next argues that Plaintiffs breach of contract claim fails because Plaintiff has failed to present any facts that an oral employment agreement was made with him personally.  Last, Defendant contends that he did not receive any personal benefit from Plaintiff's work at IREN, so her claim for unjust enrichment must fail.

We first address Defendant's motion for summary judgment because we do not need to answer the remaining questions in Plaintiff's motion if we find that she is judicially estopped from bringing her FLSA claims.

### A.   *Applicability of Judicial Estoppel*

The parties agree that Plaintiff worked for IREN until November 2018 and that she worked at least 40 hours a week.  The dispute centers on when Plaintiff started working for IREN and if she worked overtime.  Plaintiff claims she started working for IREN on July 1, 2018 and worked hundreds of hours of overtime. Defendant counters that the PERM application shows that she only worked 40 hours a week and started working at IREN on September 1, 2018.  And Plaintiff was already

---

[2]    Plaintiff covers her bases by also arguing that regular estoppel does not apply here even though Defendant does not make this argument.  We note that we agree with Plaintiff.  *See Espinoza v. Galardi S. Enters., Inc.*, 2018 WL 1729757, at *5 (S.D. Fla. Apr. 10, 2018) (citing to a string of cases that hold that the doctrine of estoppel does not generally apply to FLSA cases).

paid for these limited hours, which Plaintiff does not dispute.  The question we must therefore answer is:  is Plaintiff judicially estopped from taking a different position in this action than what the PERM application stated when she signed it under penalty of perjury?

### 1. *Standard of Review for Judicial Estoppel*

The Eleventh Circuit has explained that "[j]udicial estoppel is an equitable doctrine invoked at the court's discretion, designed 'to protect the integrity of the judicial process.'"  *Transamerica Leasing, Inc. v. Inst. of London Underwriters,* 430 F.3d 1326, 1335 (11th Cir. 2005) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)).  Courts apply this doctrine "to prevent a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *Id.*  "[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle."  *New Hampshire*, 532 U.S. at 743.  Although there is no specific test a court must follow, courts in the Eleventh Circuit typically use one of two factor-based tests when determining if judicial estoppel is applied.

The first one, derived from *New Hampshire v. Maine*, includes three factors that "typically inform the decision: (1) whether the present position is clearly inconsistent with the earlier position; (2) whether the party succeeded in persuading a court to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or second court was mislead and; (3) whether the party advancing the inconsistent

position would derive an unfair advantage. *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) (citing *New Hampshire*, 523 U.S. at 750-51). This test is typically used when the same parties are involved in both the earlier and later judicial proceedings. *See Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1182 (11th Cir. 2017) (en banc) ("The Supreme Court [in *New Hampshire*] was not presented with—and so did not address—the question of how judicial estoppel should be applied when the party seeking to invoke the doctrine was not a party to the other proceeding.").

When the party seeking to invoke judicial estoppel is not a party to the earlier judicial proceeding, the Eleventh Circuit has found the factors outlined in *New Hampshire* inapplicable. Instead, district courts in the Eleventh Circuit employ a two-part test in applying judicial estoppel: "whether (1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were calculated to make a mockery of the judicial system." *Slater*, 871 F.3d at 1181 (citing *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1281, 1285 (11th Cir. 2002)). "Under this test, a district court considers both the plaintiff's actions—whether he made inconsistent statements—and his motive—whether he intended to make a mockery of the judicial system. Judicial estoppel should not be applied when the inconsistent positions were the result of 'inadvertence[ ] or mistake' because judicial estoppel 'looks towards cold manipulation and not an unthinking or confused blunder.'" *Id.* (alteration in original) (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)).

The parties disagree what test should be applied.  But first we determine if any test should be used because they both require that there have been two distinct "proceedings."  Plaintiff argues that the submission of a PERM application is not a prior proceeding and is akin to the submission of a tax return to the U.S. Internal Revenue Service ("IRS").  Defendant is unable to present a single case where a court has determined that a PERM application is a "prior proceeding" but argues that it is a "quasi-judicial" proceeding, which would invoke judicial estoppel.  We find it instructive to outline the mechanics of the PERM application process before determining if it is a quasi-judicial proceeding.

## 2. *PERM Application*

Obtaining a green card is typically a prolonged process.  *See Gason v. Dow Corning Corp.*, 674 F. App'x 551, 555 (6th Cir. 2017).  To hire a foreign national to work permanently in the United States:

> a U.S. employer must first obtain a permanent labor certification from OFLC [Office of Foreign Labor Certification, an office of the DOL] and then submit an immigration petition to the Department of Homeland Security's ("DHS") U.S. Citizenship and Immigration Services ("USCIS"). The permanent labor certification certifies that there are not sufficient U.S. workers who are able, willing, qualified, and available to accept the particular job position intended for the foreign national, and that the employment of the foreign national will not adversely affect the wages and working conditions of similarly employed American workers.

*Gluckman v. U.S. Dep't of Labor*, 2013 WL 6184957, at *1 (E.D. Va. Nov. 26, 2013) (citing 8 U.S.C. § 1182(a)(5)(A)).  Employers are required to do this under the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(5)(A).

Submitting a PERM application to obtain a permanent labor certification is just the first step in obtaining a green card for a foreign national to work in the United States. *See Gluckman*, 2013 WL 6184957, at *1. A PERM application is subject to certain regulations that require a sponsoring employer to "submit a series of documents, including a description of the job, minimum job requirements, evidence that the sponsored employee meets those requirements, and a prevailing-wage determination from the DOL." *Gason*, 674 F. App'x at 555. "The employer must then solicit applications from United States citizens and interview every applicant who appears to be qualified. Once these steps are complete, the employer must attest to the DOL in a PERM application that no United States applicant was qualified for the job." *Id.*; *see* 20 C.F.R. § 656.17(e) (describing an employer's obligations to first recruit American employees prior to submitting a PERM application).

To monitor employers' compliance with these regulations, PERM audits some applications. *Gluckman*, 2013 WL 6184957, at *1. When auditing these applications, certifying officers follow fact-based factors. *See* 20 C.F.R. § 656.24. If a PERM application is denied, the denial must state the reasons, from which a demand for a review may be made within 30 days. *Id.* at § 656.24(e). If a second review does not result in an approval, the adverse ruling may be appealed to the Board of Alien Labor Certification Appeals, which consists of Administrative Law Judges. *See id.* A total of 102,655 PERM applications were processed in 2019 with 91.4% being approved. *See* 2 *Immigr. Law & Business* § 16:47 (2d ed.). OFLC, however, does not have an enforcement mandate. "Instead, OFLC refers any possible fraud or willful

misrepresentation in connection with the permanent labor certification program to the DOJ, DHS, or other government entity, as appropriate, for investigation." *Id.*, at *6.

### 3. *Quasi-Judicial Proceeding*

Defendant argues that judicial estoppel is not limited to "judicial proceedings" and applies here because the DOL functions in a "quasi-judicial" capacity when considering a PERM application.  Defendant supports this proposition with one case. And that case, *Dockery v. N. Shore Med. Ctr.*, runs counter to Defendant's argument. Specifically, *Dockery* held that "judicial estoppel . . . should not be applied to oaths undertaken in administrative filings", which is exactly what a PERM application submission is.  *Dockery*, 909 F. Supp. 1550, 1558 (S.D. Fla. 1995).

Indeed, district courts only invoke judicial estoppel when a "prior proceeding" involved more than an administrative filing.  *See Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 469-70 (11th Cir. 2012) (noting that statements made in divorce depositions can be used in a judicial estoppel analysis); *Apotex, Inc. v. UCB, Inc.*, 970 F. Supp. 2d 1297, 1329 (S.D. Fla. 2013) ("courts in this Circuit have applied [judicial estoppel] when the party made the prior inconsistent statements in an administrative forum, including in patent proceedings, provided that the statements were made under oath"); *Solomon Techs., Inc. v. Toyota Motor Corp.*, 2010 WL 715243, at *3 (M.D. Fla. Jan. 26, 2010) (applying judicial estoppel with regard to a construction claim that differed from the argument advanced in an administrative forum before the International Trade Commission); *Cheatwood v. Roanoke Indus.*, 891 F. Supp. 1528

13

(N.D. Ala. 1995) (applying judicial estoppel against a plaintiff who had testified, under oath, at a worker's compensation hearing).

Here, Plaintiff signed the PERM application under oath and it was submitted by her employer to the DOL, and the DOL certified it with no further follow-up.  There was not audit, no appeal, no hearing before an Administrate Law Judge, no referral by OFLC to the DOJ for an investigation of fraud.  This was simply an administrative filing akin to *Dockery* or an individual submitting her taxes to the IRS, which also does not invoke the doctrine of judicial estoppel.  *See, e.g., Leevson v. Aqualife USA Inc.*, 770 F. App'x  577, 581-82 (2d Cir. 2019).   It thus follows that Defendant's case for applying judicial estoppel crumbles.

Defendant struggles to sustain his theory on the assertion that a PERM application is different because the DOL regulations allow for the possibility of more. So given the possibility judicial estoppel – like a cat lying in wait – can still arise at some point down the road, it follows that the statements in the application should be deemed binding for estoppel purposes.  Defendant's lurking estoppel theory has no support in the caselaw, not surprisingly.  Of course, this theoretical argument for estoppel could have more merit if something came to pass that transformed the theoretical into the practical.  For example, if Plaintiff took an inconsistent position under oath at a hearing before the Board of Alien Labor Certification Appeals, we might find differently.  Based on our record, however, the certification officer simply reviewed the facts in the PERM application and did not further investigate. Defendant fails to persuade us why this is different than an IRS agent's initial review

14

of a tax return and IRS regulations that allow for an audit or possible civil or criminal investigation.  Judicial estoppel does not apply in that circumstance either.

The best Defendant can do is proclaim that the "IRS processes tax returns with often no review at all, and certainly with no investigation," but he also fails to cite to any authority that supports this theory.  But, even if true, the IRS undoubtedly has a process to audit submissions which may lead to administrative and judicial review to review adverse decisions.  But the mere fact that an administrative agency *can* do further fact finding, that could possibly put a party under oath in a hearing, does not make the initial filing a "quasi-judicial" proceeding.

Furthermore, the PERM application process is a requirement for an employer, unlike a disability application or a personal tax return.  The fact that Plaintiff only provided some of the information in the PERM application, with the rest being the ultimate responsibility of IREN, further undermines Defendant's argument. The purpose of judicial estoppel is to avoid giving one party an unfair advantage against another party.  *See Robinson*, 595 F.3d at 1273.  So, even if we construed a PERM application as a "quasi-judicial" proceeding, the law would still require that Defendant was prejudiced because of the statements made in the PERM application. But Defendant offers no evidence about when he learned of the statements made in the PERM application or how he was persuaded by those statements, which undoubtedly precludes a finding that Plaintiff received an unfair advantage. Hence no judicial estoppel follows.

In any event, if we assume a PERM application is a "prior proceeding," and apply the two-part test from *Slater*, we would still not invoke judicial estoppel because a material fact exists in Plaintiff's motivation in stating she started on September 1, 2018 and did not work overtime.  Plaintiff claims she was directed by Ms. Gomez to change her start date and hours worked to prevent IREN from having to legally pay her more than what IREN verbally offered her.  If true, which we must assume for summary judgment purposes, this may be sufficient to negate the application of judicial estoppel under the circumstances.  *See Vignoli v. Clifton Apartments, Inc.*, 2014 WL 6850775, at *10 (S.D. Fla. Oct. 7, 2014), *report and recommendation adopted*, 2014 WL 6850778 (S.D. Fla. Dec. 3, 2014) (deciding not to use judicial estoppel because "[e]ven if we give Defendants the benefit of the doubt [that the plaintiff] took an inconsistent position in his 2007 divorce proceeding, we cannot, on this record, conclusively determine that he intended to make a mockery of the judicial system . . .  [a]t the very least, there exists a question of material fact as to whether. . . [plaintiff] had the intent to manipulate the judicial system") (citing *Johnson Serv. Co.*, 485 F.2d at 175 ("Because [judicial estoppel] looks toward cold manipulation and not an unthinking or confused blunder, it has never been applied where plaintiff's assertions were based on fraud, inadvertence, or mistake.").

Of course, this does not mean that Plaintiff's statements on the PERM application are not relevant to a determination by a jury on the success of Plaintiff's claims.  The fact that Plaintiff made sworn statements that are inconsistent with her claims could hamper her ability to prevail at trial on her FLSA claims.   And

Defendant is free to raise this matter at trial for impeachment purposes. But Plaintiff is not estopped as a matter of law from raising her claims under the FLSA merely because she signed a PERM application that IREN was responsible for completing and submitting. Accordingly, Defendant's motion to preclude Plaintiff's FLSA claims should be **DENIED**.

### B. *Breach of Contract*

Turning to the breach of contract claim included in the pending complaint, Defendant argues that Plaintiff's breach of oral agreement count fails because the evidence does not show that she entered into an oral agreement with Defendant personally. Specifically, Defendant claims that nowhere in the record does Plaintiff submit any sworn testimony—her own or others— that Defendant individually hired her to work for him personally, or that Defendant promised to pay Plaintiff from his own personal funds. In response, Plaintiff points to her deposition testimony which she claims establishes that Defendant hired Plaintiff and offered her a job at a rate of $3,000 per month in June 2018 and that Defendant paid personal expenses from the IREN account.

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Kling v. Jon Bourbeau, P.A.*, 2016 WL 8730199, at *5 (S.D. Fla. Apr. 25, 2016) (citing *Vega v. T-MobileUSA, Inc.*, 564 F.3d 1256, 1272 (11th Cir.

2009) (internal citations omitted)).  For an oral agreement, "a plaintiff is required to allege facts that, if taken as true, demonstrate that the parties mutually assented to 'a certain and definite proposition' and left no essential terms open."  *Id.* (citing *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 299 (Fla. 1st DCA 1999)).

Plaintiff's breach of contract claim against Defendant must therefore show the existence of an oral agreement with Defendant, not IREN.  A reading of Plaintiff's deposition testimony, however, establishes that Defendant was acting in his capacity as an officer of IREN when he offered Plaintiff the job, not in his personal capacity to work for him.  The relevant testimony states:

> Q.          Sure. How did you start working for IREN?
> [Plaintiff].   David Basch hired me.  He presented me the company and he offered me the job.
> . . .
>
> Q.          You are saying David Basch hired you for IREN and agreed to pay you $3,000 a month, correct, in June of 2018?
> [Plaintiff].   Yes.

[D.E. 114-1, P. 12-14].

Plaintiff cites to nowhere else in the record, and the Court cannot find anything, that shows an oral agreement between Plaintiff and Defendant personally exists.  And the one case that Plaintiff cites in her response involved an oral agreement between an employee and an employer, not a personal agreement with the hiring officer of that company.  *See Richards v. Integrated Tech Group, LLC*, 2019 WL

7375290, *1 (Oct. 25, 2019).  To survive summary judgment in a case like this, an employee must demonstrate through sworn evidence that an individual employer entered into a binding contractual relationship on his behalf, not just the company/employer.  Plaintiff has not done so here.  We therefore recommend that Defendant's motion for summary judgment related to Plaintiff's breach of contract claim be **GRANTED**.

### C.   *Unjust Enrichment*

For similar reasons Defendant also requests that we enter summary judgment in his favor for Plaintiff's claim of unjust enrichment.  Defendant disputes that he ever received a personal benefit from Plaintiff's work at IREN and argues that, if Plaintiff's services did provide Defendant a personal benefit, the benefit had no value to him.  Plaintiff, on the other hand, contends that her work at IREN did provide Defendant a personal benefit – marketing Basch, LLC's real estate holdings on IREN's website – and requiring a benefit to have tangible value is a requirement of Georgia law, not Florida law.

Under Florida law, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained that benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012). Thus, no unjust enrichment claim is actionable unless a plaintiff has conferred a direct benefit on the defendant. *See Peoples Nat. Bank of Commerce v. First Union Nat.*

*Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996) (holding that the conferral of a direct benefit is required); *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331 (Fla. 5th DCA 2007) (same); *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (dismissing unjust enrichment claim where benefit conferred was too indirect). "A benefit that a defendant gains that does not come directly from the plaintiff does not give rise to a claim for unjust enrichment." *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011) (citations omitted).

Plaintiff's unjust enrichment claim is governed by Florida law as that is where Plaintiff allegedly performed her services for Defendant. And we agree with Plaintiff that looking at a benefit's value is based on Georgia law. Georgia's requirement that a plaintiff must show the value of the benefit conferred is therefore not applicable here. Instead, under Florida law, we must determine the "reasonable value of the labor performed" by Plaintiff when conferring the benefit to Defendant. *See, e.g.*, *Solutec Corp. v. Young & Lawrence Assocs., Inc.*, 243 So. 2d 605, 606 (Fla. 4th DCA 1971) ("The measure of recovery . . . is the reasonable value of the labor performed and the market value of any materials furnished, and not the value to the defendant that the completed project represents.").

With that in mind, Defendant still argues that Plaintiff never conferred any benefit to him personally. Plaintiff, however, claims that while at IREN she marketed Defendant's real estate holdings owned by Basch, LLC on IREN's website. If this was a benefit for IREN or Defendant personally is in dispute — Defendant

claims he allowed IREN to market Basch, LLC properties to help IREN's listings and Plaintiff claims they were marketed solely to help Defendant sale them.  Regardless, the work Plaintiff did at IREN was for IREN and any benefit Defendant may have received through his relationship with Basch, LLC would clearly be an indirect one. *See Century Sr. Servs.*, 770 F. Supp. 2d at 1267 (finding any benefit to be too indirect when derived through other corporations).  Moreover, Plaintiff has not provided us with any persuasive authority that, under these same circumstances, an unjust enrichment claim can stand only based on a showing of a traditional employer/employee relationship.

Accordingly, Defendant's motion for summary judgment related to Plaintiff's claim for unjust enrichment should be **GRANTED**.

### D. *"Employer" and "Joint Employer" Under the FLSA*

Because the parties agree that IREN employed Plaintiff, we last determine if Defendant is an "employer" through his role with IREN and if he is a "joint employer" under the FLSA.  Pursuant to the FLSA, "employers must pay employees minimum and overtime wages. *Olivas v. A Little Havana Check Cash*, Inc., 324 F. App'x 839, 844 (11th Cir. 2009) (citing 29 U.S.C. §§ 206, 207).  An individual cannot be held "liable for violating the overtime provision of the FLSA unless he is an 'employer' within the meaning of the Act." *Alvarez Perez v. Sanford-Orlando Kennel Club*, Inc., 515 F.3d 1150, 1160 (11th Cir. 2008) (citing 29 U.S.C. § 207(a)(1); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984)).

The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see also Gutierrez v. Galiano Enters. of Miami, Corp.*, 2019 WL 2410072, at *2 (S.D. Fla. June 7, 2019). Whether an individual comes under the scope of this definition "does not depend on technical or 'isolated factors but rather on the circumstances of the whole activity.'" *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). A corporate officer can therefore be, along with the corporation, jointly and severally liable under the FLSA for unpaid wages. *Patel v. Wargo*, 803 F.2d 632, 637-38 (11th Cir. 1986). In general, "a corporation's officers will exercise more operational control than its directors and therefore be more susceptible to personal liability. *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1310 (11th Cir. 2013). However, the "status as a corporate officer alone is insufficient to render an individual an 'employer' to hold the officer personally liable for unpaid wages." *Olivas*, 324 F. App'x at 845.

Instead, a corporate officer "must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." *Patel*, 803 F.2d at 638. The Eleventh Circuit explained in *Lamonica* that "[a] supervisor's ownership interests in the corporation and control over the corporation's day-to-day functions are relevant to [whether the individual is an employer] because they are indicative of the supervisor's role in causing the violation." *Lamonica*, 711 F.3d at 314. However, the "primary concern is the supervisor's role in causing the FLSA

violation" and "to support individual liability, there must be control over 'significant aspects of the company's day-to-day functions, including compensation of employees or other matters in relation to an employee.'" *Id.* (quoting *Alvarez Perez*, 515 F.3d at 1160).

"A co-owner's occasional control of the day-to-day business operations or employee supervision is sufficient to bring the co-owner within the FLSA definition." *Barrios v. Solasi Accounting & Tax Advice & Design of Words in Dark Blue at Left Side Has a Circle Colored Blue, Purple, & Green Light*, 2019 WL 5566344, at *2 (S.D. Fla. Oct. 9, 2019) (citing *Olivas*, 324 F. App'x at 845-46). The test elucidated by the Eleventh Circuit in *Patel* and reaffirmed by the same Court in *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, is a disjunctive one, requiring either that the individual be "be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." *Patel*, 803 F.2d at 638. Thus, Defendant would be an "employer" under the FLSA if he either directly supervised Plaintiff or had occasional control of the day-to-day functions of IREN. We find that Defendant is an "employer" based on the latter.

IREN only operated for a few months, and Defendant clearly controlled IREN when it first started. This is evident by Defendant registering its website name (the central piece of its business) before he even met Farron, paying for and overseeing its legal formation, keeping over 50% of its ownership between him and his former wife, being the president, and having the company run out of his condo, which allowed him to see oversee all of IREN's operations. Defendant also controlled IREN at its end as

he is the one who closed its bank account and moved to dissolve the company when Farron, among other IREN employees, stopped communicating with him, not the other way around.  Did Defendant relinquish control of IREN during the couple of months in between IREN's inception and ending?  Defendant claims that he did and that him being a part owner, a signatory, and president mean little under *Alvarez Perez* without substantially more, which is not present on this record.  But, the record suggests there is substantially more.

To start, Defendant argues he had little knowledge of IREN's finances.  This is belied by the record.[3]  The record shows that Defendant knew of many of the major financial transactions of IREN and had access to every transaction.   Defendant is the one who opened and closed IREN's bank account and was a co-signer on company checks and major third-party agreements.  This includes Defendant knowing about IREN's major operating expenses: operating out of its office (his condo), running the website, marketing, and paying employees.  He is the one who approved and paid for IREN's office space and knew how much it cost to maintain and convert into office space, including creating the green room.  He also could see any other minor office expense as he was always present in the office.  He paid for the website registration and signed the agreement with one of its largest vendors, Citrus7.  He knew how much it cost to market the company as he hosted real estate professionals at the office

---

[3]     Defendant has a habit of mischaracterizing the undisputed facts.  For example, Defendant's own statement of material facts states that employees stopped working out of Defendant's condo after August 2018 [D.E. 134], but his response to Plaintiff's motion claims that no one worked at his condo after Farron moved out in April 2018. [D.E. 135].

and had his own properties posted on IREN's website.  He knew that most of the IREN employees were paid minimum wage and he signed some employee pay checks. Defendant also knew about IREN's revenues, which were almost non-existent.

To put it simply, IREN only operated for a few months and its business was running a website out of Defendant's condo, so it did not have many financial transactions over its life span.  And the few major ones it did have, Defendant either approved them personally or knew about them.  Because financial control over a corporation is a significant factor in determining "employer" status, this cuts towards finding Defendant was an "employer."  *See Elliot Travel & Tours*, 942 F.2d 966 (6th Cir. 1991); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (imposing FLSA liability on a "top man" who guided corporate policies and controlled business' "purse strings").

Defendant contends nevertheless that he "played no role in any day-to-day operations of IREN . . . Basch did not supervise employees at all."  But this conclusory defense ignores the critical fact that he, during the entirety of IREN's short existence, controlled IREN's office.  Defendant literally held the key in controlling when employees, including Farron, could come to work.  Defendant was always the first one in the office and last to leave; he couldn't help it, he lived at work.  Defendant's complete control over IREN's office space was a "significant aspect" of IREN's day-to-day functions.  *See Alvarez Perez*, 515 F.3d at 1160.

Defendant also knew that most of the employees were paid hourly minimum wage and witnessed the hours they worked each day, so he would know when they

worked more than 8 hours in a single day.  This fact coupled with Defendant's control of the office, large ownership of IREN, control of its major finances, and role as president, all show that Defendant was in the *best* position to avoid any FLSA violations.  *See Lamonica*, 711 F.3d at 314 ("Again, our primary concern is the supervisor's role in causing the FLSA violation.").  Further, IREN's employees worked out of Defendant's condo until at least August 2018 [D.E. 134], and Farron moved out in April 2018, so Defendant was the corporate officer that was always present at the office for months, not Farron.  At the minimum, this occasional control is enough for Defendant to be an "employer" under the FLSA.  *See Barrios*, 2019 WL 5566344, at *2 (S.D. Fla. Oct. 9, 2019).

Even if Defendant did not run team meetings or pre-approve every operational or hiring decision made at IREN, this does not mean he did not control a significant aspect of IREN's day-to-day operations or could not prevent FLSA violations.  *See Hodgson*, 471 F.2d at 237 (evaluating "employer" status "does not depend on technical or isolated factors but rather on the circumstances of the whole activity.").  When looking at the activities of IREN and Defendant in whole, we find that Defendant is an "employer" under the FLSA.  No reasonable juror could conclude otherwise given the overwhelming evidence in the record.  Accordingly, Plaintiff's motion for summary judgment in relation to Defendant's status as an "employer" under the FLSA should be **GRANTED**.[4]

---

[4]     Because we find (1) Defendant is an "employer" under the FLSA and thus may be personally liable for any FLSA violations committed by IREN and (2) no evidence was presented that Defendant hired Plaintiff to work for him personally by oral

## IV.   CONCLUSION

For the foregoing reasons, we hereby **RECOMMEND** that Defendant's motion for summary judgment [D.E. 117] be **GRANTED in part** and **DENIED in part** and Plaintiff's motion for summary judgment [D.E. 129] be **GRANTED in part** and **DENIED in part**:

A.   Defendant's motion for summary judgment on Plaintiff's breach of contract claim should be **GRANTED**.

B.   Defendant's motion for summary judgment on Plaintiff's unjust enrichment claim should be **GRANTED**.

C.   In all other respects, Defendant's motion for summary judgment should be **DENIED**.

D.   Plaintiff's motion for partial summary judgment that Defendant be deemed Plaintiff's employer should be **GRANTED**.  The motion relating to Defendant's "joint employer" status should be **DENIED as moot**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on

agreement, a "joint employer" analysis and determination is moot.  *See, e.g. Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996) (applying a "joint employer" analysis when an individual is "jointly employed by, more than one entity at the same time.")  (citing 29 C.F.R. § 791.2).

appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

      **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 24th day of July, 2020.

                                  /s/ *Edwin G. Torres*
                                  EDWIN G. TORRES
                                  United States Magistrate Judge